UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| DONNA J. WEAVER,, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL NO.  1:16cv268 |
| | ) | |
| NANCY A. BERRYHILL, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

OPINION AND ORDER

This matter is before the court for judicial review of a final decision of the defendant

Commissioner of Social Security Administration denying Plaintiff's application for Disability

Insurance Benefits (DIB) as provided for in the Social Security Act.  42 U.S.C. §416(I).  Section

205(g) of the Act provides, inter alia, "[a]s part of his answer, the [Commissioner] shall file a

certified copy of the transcript of the record including the evidence upon which the findings and

decision complained of are based.  The court shall have the power to enter, upon the pleadings

and transcript of the record, a judgment affirming, modifying, or reversing the decision of the

[Commissioner], with or without remanding the case for a rehearing."  It also provides, "[t]he

findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be

conclusive. . . ."  42 U.S.C. §405(g).

The law provides that an applicant for disability insurance benefits must establish an

"inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to last for a continuous period of no less

than 12 months. . . ."  42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A).  A physical or mental

impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3). It is not enough for a plaintiff to establish that an impairment exists. It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity. *Gotshaw v. Ribicoff*, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); *Garcia v. Califano*, 463 F.Supp. 1098 (N.D.Ill. 1979). It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff. *See Jeralds v. Richardson*, 445 F.2d 36 (7th Cir. 1971); *Kutchman v. Cohen*, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings." *Garfield v. Schweiker*, 732 F.2d 605, 607 (7th Cir. 1984) citing *Whitney v. Schweiker*, 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. §405(g). "Substantial evidence is defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984) quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); *see Allen v. Weinberger*, 552 F.2d 781, 784 (7th Cir. 1977). "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law." *Garfield*, *supra* at 607; *see also Schnoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after consideration of the entire record, the Administrative Law Judge ("ALJ") made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act

through March 31, 2016.

2.    The claimant has not engaged in substantial gainful activity since July 1, 2011, the alleged onset date (20 CFR 404.1571 *et seq*.).

3.    The claimant has the following severe impairment: diabetes mellitus (20 CFR 404.1520(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)..

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: no work at unprotected heights or around hazardous, moving machinery.

6.    The claimant is capable of performing past relevant work as an audit clerk and as a retail stocker. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.    The claimant has not been under a disability, as defined in the Social Security Act, from July 1, 2011, through the date of this decision (20 CFR 404.1520(f)).

(Tr. 19-28)

Based upon these findings, the ALJ determined that Plaintiff was not entitled to disability insurance benefits. The ALJ's decision became the final agency decision when the Appeals Council denied review.  This appeal followed.

Plaintiff  filed her opening brief on May 5, 2017.  On August 16, 2017, the defendant filed a memorandum in support of the Commissioner's decision. Plaintiff has declined to file a reply.  Upon full review of the record in this cause, this court is of the view that the ALJ's decision should be affirmed.

A five step test has been established to determine whether a claimant is disabled.  *See*

*Singleton v. Bowen*, 841 F.2d 710, 711 (7th Cir. 1988); *Bowen v. Yuckert*, 107 S.Ct. 2287, 2290-91 (1987). The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

*Nelson v. Bowen*, 855 F.2d 503, 504 n.2 (7th Cir. 1988); *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985); accord *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984). From the nature of the ALJ's decision to deny benefits, it is clear that step four was the determinative inquiry.

In June 2012, Plaintiff filed her second application for disability insurance benefits under Title II of the Social Security Act (Act), alleging disability beginning July 1, 2011 (Tr. 194). The agency denied this application initially and upon reconsideration (Tr. 81, 82, 83, 109-12, 116-18). ALJ Steven Neary presided over a hearing in August 2013 (Tr. 60-78). In October 2013, he issued a decision finding that Plaintiff was not disabled and not entitled to benefits (Tr. 87-95). The Appeals Council accepted review and remanded this matter to the ALJ for further proceedings to consider further the severity of Plaintiff's impairments and reconsider her residual functional capacity (Tr. 101-03). The ALJ conducted a new hearing in October 2014, at which Plaintiff, who was represented by an attorney, and a vocational expert testified (Tr. 36-59). The ALJ issued a new decision in January 2015, finding that Plaintiff did not meet the Social Security

Administration's definition of disability and was not entitled to benefits (Tr. 17-28). In May 2016, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner (Tr. 1-4). *See* 20 C.F.R. §§ 404.955, 404.981. Plaintiff then filed the current action for administrative review of the ALJ's second decision.

In March 2006, Dr. J. Matthew Neal noted that Plaintiff had type I diabetes and did not recognize hypoglycemia very well (Tr. 400). Plaintiff asked Dr. Neal to complete disability forms for her in April 2006 (Tr. 399). Dr, Neal noted "relatively" poor controlled diabetes (Tr. 399). In a letter discussing Plaintiff's fitness for work, also dated in April 2006, Dr. Neal advised that because of her hypoglycemia, Plaintiff should not work in areas that involved heavy or hazardous machinery (Tr. 410). He estimated Plaintiff's risk of a recurring hypoglycemic episode as "moderate' (Tr. 410). Regarding Plaintiff's general fitness for work, Dr. Neal noted that, as an endocrinologist, he did not perform work capabilities evaluations, but he found Plaintiff to be a healthy and fit person who should be able to do most tasks assuming her blood glucose level was normal (Tr. 410).

A treatment record from August 2007 from Preferred Family Physicians indicates Plaintiff had hypertension that was under control (Tr. 359). In September 2006, Dr. Neal noted a history of hypothyroidism, but laboratory testing was normal (Tr. 406). Records from 2006 and 2007 also document a diagnosis of acute sinusitis (Tr. 361, 367, 370, 371). In February 2008, Dr. Stephen R. Myron reported that Plaintiff has had type 1 diabetes "for many years" (Tr. 404). She did not check her blood sugar very often because she could not afford test strips (Tr. 404).

In January 2009, Dr. Neal examined Plaintiff and noted that Plaintiff had been noncompliant with her visits (Tr. 447). He noted that Plaintiff had complications from diabetes,

including possible early chronic kidney disease and neuropathy (Tr. 447). Dr. Neal continued treating Plaintiff with medication, but cautioned that he could not do much unless Plaintiff was more compliant with her visits (Tr. 447).

Plaintiff saw Thomas Stewart, M.D., in early April 2009 (Tr. 446). Dr. Stewart noted that he had not seen Plaintiff for approximately one year, that Plaintiff's control of her diabetes was erratic, and that Plaintiff had a history of gastroparesis (Tr. 446). Plaintiff reported eating only one meal per day and experiencing some nausea (Tr. 446). He continued to treat Plaintiff's conditions with medication (Tr. 446).

Plaintiff was admitted to the hospital in May 2010 for acute renal failure attributable to diarrhea and the use of ibuprofen (Tr. 460). The physician recommended changing her hypertension medication, which was causing Plaintiff's headaches. (Tr. 460). Review of systems was unremarkable for any neurologic, cardiac, pulmonary, abdominal, gastrointestinal, musculoskeletal, or other issues (Tr. 464).

In January 2011, Dr. Stewart noted that Plaintiff's right hand went numb intermittently but that Plaintiff did not report dropping things (Tr. 487). In February 2011, Plaintiff visited Central Indiana Orthopedics complaining of triggering and pain and stiffness in her left thumb and middle finger and numbness in her right hand, yet the examining physician found "no real significant triggering" (Tr. 477). Examination showed that the "remainder" of the left hand was normal (Tr. 477). Examination of the left hand revealed positive Tinel and median nerve compression, as well as mild Phalen (Tr. 477). The doctor diagnosed carpel tunnel syndrome in the right hand (Tr. 477). In March, Plaintiff had a trigger release in the left hand; the doctor anticipated that Plaintiff would be off work for three weeks (Tr. 478).

Kevin Schopmeyer, M.D., conducted a consultative examination in July 2012 (Tr. 547-62). This examination revealed that Plaintiff had normal range of motion in the spine, upper extremities, wrist, and lower extremities (Tr. 547). Plaintiff was able to get on and off the examination table without any problems (Tr. 549). Cardiac examination was normal (Tr. 550). Examination of the abdomen and extremities was normal with the exception of Plaintiff's amputated right thumb (Tr. 550). Musculoskeletal examination was unremarkable (Tr. 551). Neurological examination indicated normal strength but diminished reflexes in the upper and lower extremities (Tr. 552). Plaintiff had normal grip strength (Tr. 552). Her sensory system was intact (Tr. 552). Dr. Schopmeyer noted that Plaintiff adapted well to amputation of her right thumb but should avoid use of hazardous power equipment (Tr. 553). He also noted that Plaintiff's diabetes was uncontrolled, but Plaintiff's kidney problems had resolved (Tr. 553). Dr. Schopmeyer also recommended that Plaintiff comply with a gastroparesis diet (Tr. 553). Dr. Schopmeyer's report indicated that Plaintiff could walk twelve blocks, stand eight to twelve hours, and lift up to fifty pounds with both arms (Tr. 556). Plaintiff had a normal gait when walking (Tr. 557). She demonstrated no difficulty with fine motor skills (Tr. 558).

At the end of July 2012, M. Brill, M.D., who reviewed Plaintiff's medical records for the state disability determination agency, determined that Plaintiff did not have a severe impairment (Tr. 563). Robert Bond, M.D., concurred with Dr. Brill's findings in September 2012 (Tr. 564).

Dr. Stewart noted in May 2013, that Plaintiff's blood sugar was in the 200s but Plaintiff declined bloodwork (Tr. 599). Neurological and other physical examination findings were normal (Tr. 599). A treatment note from Dr. Stewart at the end of August 2013 noted that he had not seen Plaintiff for two years because of lack of insurance (Tr. 568). Plaintiff reported having nausea that

day, but no abdominal pain or diarrhea (Tr. 568). Plaintiff also complained of paresthesia and limb weakness and joint pain (Tr. 568). Dr. Stewart's examination revealed that Plaintiff walked with a normal gait and had normal muscle strength and tone (Tr. 570). He prescribed Lasix for Plaintiff's diabetic neuropathy (Tr. 570). Dr. Stewart made similar findings on September 20, 2013, and prescribed medication for hypertension (Tr. 591-93). In November 2013, Plaintiff declined medication for neuropathy (Tr. 590). Physical examination was normal, including normal gait and muscle strength (Tr. 590). Physical examination on February 14, 2014 was also normal (Tr. 587).

Plaintiff went to the emergency room on March 6, 2014, because her family believed her glucose level was low (Tr. 634). Examination of Plaintiff's musculoskeletal, gastrointestinal, and neurologic systems was normal (Tr. 635). The hospital discharged her to her home/self-care that same day (Tr. 636). That same month, Dr. Stewart prescribed a glucagon emergency injection kit for Plaintiff's diabetic hypoglycemia (Tr. 584, 667). In April 2014, Dr. Stewart suggested Plaintiff see a dietician but Plaintiff refused (Tr. 580).

On September 23, 2014, Plaintiff went to the emergency room after having pulled to the side of the road while driving (Tr. 608). She presented with hypoglycemia (Tr. 608). The emergency room provided Plaintiff food and juice (Tr. 608). Musculoskeletal examination indicated normal range of motion and strength (Tr. 610). Neurological examination was also normal, with normal sensory observed (Tr. 610). Dr. Elmer Toliver, the emergency room doctor, released Plaintiff and indicated "Limited activity, Limited work, No heavy lifting" (Tr. 612). Dr. Stewart saw Plaintiff the next day (Tr. 646-49). He noted normal findings from physical examination of Plaintiff (Tr. 647-48), just as he had earlier that month (Tr. 652).

8

Dr. Stewart examined Plaintiff on October 10, 2014 (Tr. 641-44). He observed her to be in no acute distress (Tr. 642). Plaintiff demonstrated normal gait, muscle strength, and muscle tone (Tr. 643). Dr. Stewart continued Plaintiff on insulin and other medication (Tr. 643-44).

Plaintiff indicates that in addition to diabetes she has the additional impairments of gastroparesis, constipation, diarrhea, right thumb amputation, hypothyroidism, hypertension, sinus headaches, aching lower back, aching legs, feet neuropathy, hand nephropathy, and edema.

At the August 2013 hearing, Plaintiff testified that she lived alone (Tr. 62). She last worked in November and December 2012 (Tr. 62). Prior to then, she worked at a plastics company for one and one-half years, and before that a paper company for 27 years (Tr. 64). Plaintiff believed she could perform her work at the plastics company, but the company closed (Tr. 65). She also noted that her blood sugar drops because of her diabetes, and that she can pass out at any time (Tr. 65). The last "bad" episode of passing out occurred that prior November (Tr. 65).

According to Plaintiff, "[d]iabetes is the main thing" that affected her ability to work, although she noted that her doctor recently diagnosed her with nerve damage in her legs and she experienced leg pain at night (Tr. 66-67). Plaintiff also testified that she lost part of her right thumb in 2000, but it did not prevent her from performing a machine operator job (Tr. 67). However, Plaintiff testified that she had trouble gripping objects (Tr. 69).

Plaintiff performed such activities as mowing her lawn with a push mower, although she said that it took her longer than it used to (Tr. 68). She estimated that she could stand/walk for about 20 minutes at a time, and sit for 15 minutes (Tr. 68-69). She estimated she could lift up to 10 pounds (Tr. 70). For the past year-and-a-half, Plaintiff volunteered at a food pantry twice

weekly (Tr. 70). She could dress and bathe herself (Tr. 70). She could not identify any household chores she was unable to do (Tr. 71). Plaintiff drove a car (Tr. 71).

Plaintiff's daughter explained that her mother's diabetes "has really started affecting her" insofar as it affected her mother's ability to stand and walk (Tr. 72). Plaintiff's daughter did not identify any other physical or work-related limitations, but noted that her mother experienced episodes where her blood "sugar bottom[ed] out," which resulted in her mother's laying on the floor (Tr. 72-73).

A vocational expert classified Plaintiff's prior mold machine operator work as light work, but medium work as performed (Tr. 75). He also testified that a hypothetical person with Plaintiff's education and work history who was limited to light work could perform Plaintiff's past work as an editor/clerk and mold machine operator, but not as she had performed it (Tr. 76). He testified that no jobs existed that such a person could perform if the limitations to which Plaintiff testified were credited (Tr. 76-77).

The ALJ held a second hearing in October 2014 (Tr. 36-59). At the time of this hearing, Plaintiff had been working for 11 months as a cashier for approximately 20 hours weekly, but she no longer volunteered at the food pantry (Tr. 39-40). This job involved "a lot of standing, a lot of walking around the store" as well as placing "totes of items" on shelves (Tr. 49). She described her ability to function as "about the same" as she had testified at the prior hearing, although she found herself getting more tired after work (Tr. 40). Plaintiff still mowed her lawn, and she watched her grandchildren approximately three times each week (Tr. 51).

Plaintiff testified to a car accident in which she was involved two weeks before the hearing; her blood sugar dropped while she was driving (Tr. 41). She did not lose consciousness

but lost control of her car (Tr. 42-43). She explained that in the past "few" months, she experienced drops in her blood sugar three to four times per month, most frequently when she was asleep (Tr. 40-41). The prior April, she went to the emergency room because of low blood sugar (Tr. 43). As of two weeks before the hearing, Plaintiff began checking her blood sugar six to ten times daily (Tr. 44). Prior to that, she checked it at most once a day (Tr. 44).

Plaintiff testified to other conditions as well. She did not feel hungry when she was supposed to, and she had constipation and diarrhea (Tr. 44-45). She experienced diarrhea three times weekly (Tr. 45). Sometimes she had dizzy spells, but they did not cause her to fall at work (Tr. 45). Plaintiff testified that she had to take on average one unscheduled break per week at work when she felt her blood sugar dropping (Tr. 45). Plaintiff experienced on average two episodes of low blood sugar levels per month at her home, and half the time this resulted in her falling (Tr. 46). Nonetheless, Plaintiff continued to live by herself (Tr. 46). She also experienced sinus headaches more than once per month (Tr. 47). For over the past year, her feet felt like "they're on fire constantly," most seriously at night, when she was off her feet (Tr. 48). Plaintiff's physician prescribed Lyrica to address the burning sensation, but Plaintiff did not want to take it (Tr. 48). She also experience burning, but less severely, in the palm of her hands (Tr. 48). Two to three times a year Plaintiff experiences leg pain (Tr. 50-51).

The ALJ asked a vocational expert to consider a 59 year old person with Plaintiff's vocational background who was limited to occupations that did not require working at unprotected heights or operating hazardous machinery (Tr. 54). The vocational expert testified that such a person could perform Plaintiff's past work as an audit clerk (both as typically performed and as Plaintiff performed it) and retail stocker (as typically performed) (Tr. 54). The

vocational expert also testified that a person with the limitations testified to by Plaintiff could not perform any jobs that existed in significant numbers in the national economy because of Plaintiff's need to change positions every 15 minutes and to take unscheduled breaks (Tr. 54).

In support of remand, Plaintiff first argues that the ALJ erred in failing to consider all of her impairments in combination. Plaintiff claims that her thumb amputation and her gastroparesis were not properly accounted for in the RFC. However, this argument is not supported by Plaintiff's own testimony. Plaintiff testified that diabetes was "the main thing" that affected her ability to work (Tr. 66-67). The ALJ acknowledged that Plaintiff had many non-severe impairments (Tr. 20-23).The ALJ devoted a considerable portion of his opinion discussing each such impairment and its minimal effect on Plaintiff's functional capacity (Tr. 20-23). Among other things, he noted that several of these impairments, such as her diarrhea and gastrointestinal conditions, did not require treatment (Tr. 21). He noted that others, such as her right thumb amputation, pre-dated her alleged onset date and had never prevented her from working (Tr. 21). The ALJ noted that despite the amputation, physical examinations showed that Plaintiff retained full grip strength and normal ability for fine finger manipulation (Tr. 21, 552, 558). He accurately observed that yet other non-severe impairments, such as Plaintiff's hypothyroidism and hypertension, resulted in the manifestation of no symptoms (Tr. 21-22). In fact, as the ALJ observed, medication controlled Plaintiff's benign hypertension (Tr. 22, 359). He also explained that her complaints of a burning sensation in her extremities (presumably resulting from diabetic neuropathy) did not prevent her from performing her current cashier job, that Plaintiff reported symptoms to be worse at night when she was not standing, and that, despite her complaints, physical examination repeatedly showed normal gait and intact sensory system (Tr. 22).

12

Additionally, Plaintiff fails to acknowledge that Dr. Stewart was aware of all these impairments, yet still did not impose any work-preclusive restrictions.

Plaintiff also argues that the ALJ erred in finding that Plaintiff could perform past relevant work. In making this finding, the ALJ adopted the testimony of the vocational expert who testified at the second hearing (Tr. 27-28). The ALJ noted that Plaintiff's residual functional capacity "would not preclude her from performing work as an audit clerk, both as generally performed and as the claimant actually performed this job, or as a retail stock clerk, as it is generally performed" (Tr. 27). The ALJ further noted that Plaintiff performed some stocking work as part of her current job as a cashier (Tr. 27).

The vocational expert based her testimony on a hypothetical question that asked the vocational expert to consider a person of Plaintiff's age and vocational background who could perform work at all exertional levels but who could not perform work at unprotected heights or around hazardous, moving machinery (Tr. 54). These restrictions match those that the ALJ included in his RFC finding (Tr. 23). The determination that Plaintiff can perform work that does not involve unprotected heights or heavy machinery is consistent with the opinion of endocrinologist Dr. J. Matthew Neal, who, when assessing Plaintiff's fitness for work, recommended that Plaintiff not work around heavy or hazardous machinery, but otherwise deemed her able to perform "most" tasks (Tr. 410). As the ALJ explained, this restriction accounted for Plaintiff's hypoglycemic episodes and dizziness (Tr. 24, 26). Notably, no physician with whom Plaintiff had established a long-term treating relationship recommended any work-related restrictions greater than those that the ALJ imposed. In fact, Dr. Thomas Stewart, who treated Plaintiff from at least 2009 through 2014, never indicated that Plaintiff had any

functional restrictions, let alone advised that she should or could not work. Despite her complaints and his diagnoses, even after Plaintiff's alleged disability onset, Dr. Stewart regularly reported normal findings upon physical examination (Tr. 570, 587, 590, 599, 643, 647-48, 652).

As noted, Dr. Kevin Schopmeyer, who conducted a consultative examination in July 2012 (approximately one year after Plaintiff's alleged onset date), made findings similar to those that Dr. Stewart frequently reported. Dr. Schopmeyer found that Plaintiff had normal range of motion and could get on and off the examination table without problem (Tr. 547, 549). Musculoskeletal examination was unremarkable (Tr. 551). While Plaintiff showed diminished reflexes in her extremities, neurological examination was otherwise normal and her sensory system was intact (Tr. 552). Plaintiff demonstrated no difficulty with fine motor skills (Tr. 558). Dr. Schomeyer found that Plaintiff could walk twelve blocks, stand eight to twelve hours, and lift up to fifty pounds with both arms (Tr. 556). These findings are consistent with the ALJ's RFC finding, and his ultimate determination that Plaintiff could perform two of her past relevant jobs.

Plaintiff cites only the opinion of Dr. Elmer Toliver, the emergency room physician who treated her on September 23, 2014 (Tr. 612). Plaintiff notes that Dr. Toliver advised that Plaintiff should engage in only "limited" activity and work, and no "heavy lifting." (citing Tr. 612). While the ALJ did not adopt these restrictions, he was not required to do so. Under the regulations, an ALJ is to give a treating physician's opinion weight in proportion to the length of the treatment relationship and the frequency of examination. *See* 20 C.F.R. § 404.1527(c)(2)(i). Unlike Drs. Neal and Stewart, Dr. Toliver met and examined Plaintiff only once. Also, the better an explanation a medical source provides for an opinion, the more weight an ALJ will give it. *See id.* § 404.1527(c)(3). Dr. Toliver gave little if any such explanation. In fact, he did not define

"limited" activity or work, and did not indicate for how long these limitations should be in effect. The regulations further advise, "the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion." *Id*. § 404.1527(c)(4). Dr. Toliver's opinion merits little weight under this provision as well. As noted, the restrictions he suggested are inconsistent with Drs. Neal's and Stewart's examination findings and opinions. Dr. Neal recommended only that Plaintiff not work around heavy machinery. Dr. Stewart never imposed or suggested any work-related or functional restrictions.

In any event, even if the ALJ should have adopted Dr. Toliver's restrictions and prevented Plaintiff from performing heavy lifting, that error is harmless because Dr. Toliver's limitations did not prevent Plaintiff from performing at least one of her past relevant jobs. The audit clerk work that the ALJ found Plaintiff still capable of performing is sedentary work (Tr. 347). *See* Dictionary of Occupational Titles 210.382-010. Sedentary work is the classification of work requiring the least amount of exertion under the regulations. It involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like files, ledgers, and small tools, and only standing and/or walking for two hours each workday. 20 C.F.R. § 416.967(a); Social Security Ruling (SSR) 83-10, 1983 WL 31251, at *5.

Plaintiff's next argument relates to whether the ALJ properly assessed Plaintiff's credibility. Plaintiff alleges greater limitations than those that the ALJ found. She testified that she could stand and walk for only a short time because of pain and stiffness in her legs (Tr. 68-69). She also testified that she had to take unscheduled breaks at work (Tr. 45). The vocational expert at the second hearing testified that no jobs existed in significant numbers that Plaintiff could perform, if Plaintiff's testimony were fully credited (Tr. 54). The ALJ, however, did not

find Plaintiff's statements regarding the intensity, persistence, and limiting effects of her symptoms to be entirely credible (Tr. 24). Plaintiff contests this finding, and argues that the ALJ should have fully credited her testimony in light of her long work history.

Plaintiff must surmount a high hurdle to prevail on this argument. Courts give significant deference to an ALJ's credibility finding. An ALJ's credibility determination is overturned only if "patently wrong" because an ALJ is in the best position to determine a witness's truthfulness and forthrightness. *Skarbek v. Barnhart*, 390 F.3d 500, 504-05 (7th Cir. 2004). "It is only when the ALJ's determination lacks any explanation or support that [the court] will declare it to be 'patently wrong.'" *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008). Plaintiff "must do more than point to a different conclusion that the ALJ could have reached to demonstrate that the credibility determination was patently wrong." *Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010). In fact, under the "patently wrong" standard, to survive judicial scrutiny "[n]ot all of the ALJ's reasons must be valid as long as enough of them are." *Halsell v. Astrue*, 357 F. App'x 717, 722-23 (7th Cir. 2009). In the present case, Plaintiff has not demonstrated that the ALJ's credibility finding was patently wrong.

While Plaintiff correctly notes that her long work history may bolster her credibility, she fails to acknowledge that other considerations may inform an ALJ's credibility determination. These include the lack of consistency between the objective medical evidence and a claimant's complaints. 20 C.F.R. § 404.1529(c); accord SSR 96-7p, 1996 WL 374186, at *5 ("One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record."). The ALJ correctly noted that Plaintiff's testimony of disabling symptoms is at odds with the objective medical findings of record (Tr. 26, 27). For

example, her testimony of inability to grip objects is flatly inconsistent with findings of normal grip strength (Tr. 69, 552). And, as explained above, Plaintiff's diagnoses and complaints notwithstanding, Drs. Neal and Stewart routinely indicated normal results on physical examination, including normal gait, muscle strength, and sensation. Dr. Schopmeyer made similar findings in his consultative examination in 2012. None of the physicians found Plaintiff's functioning as limited as Plaintiff claimed.

Additionally, the record is replete with references to Plaintiff's failure to follow prescribed treatment, which the ALJ also cited in support of his credibility determination (Tr. 25-26). Such non- compliance included failure to check her blood sugar levels, attend doctor appointments, consent to bloodwork, take medication her doctor wished to prescribe, maintain a proper diet, and see a dietician (Tr. 25-26, 404, 446, 447, 580, 599). Seventh Circuit precedent permits an ALJ to draw adverse credibility inferences from a claimant's failure to follow prescribed treatment. *See, e.g., Mitze v. Colvin*, 782 F.3d 879, 882 (7th Cir. 2015) ("She turned down other treatment options as well—still another reason to think she may have been exaggerating her symptoms."); *Castile v. Astrue*, 617 F.3d 923, 930 (7th Cir. 2010) ("The ALJ also found it particularly instructive that Castile either refused or utterly failed to adhere to the treatment programs prescribed by her physicians."). In fact, the court noted the relevance of a diabetic claimant's failure to comply with dietary recommendations. *See Dixon v. Massanari*, 270 F.3d 1171, 1179 (7th Cir. 2001). Plaintiff argues that she failed to comply with treatment out of financial considerations, and could not maintain a proper diet to stabilize her blood sugar because of her gastroparesis, but neither sufficiently explains her failures. The ALJ noted, for example, that Plaintiff finally began to check her blood sugar six to 10 times daily as of two weeks before the

second hearing, but prior to that she checked it once per day at most (Tr. 24, 43-44). This testimony suggests Plaintiff had the financial resources to monitor her blood sugar. Similarly, the ALJ noted that Plaintiff's physician had suggested Plaintiff look into an indigent drug program to obtain glucagon (Tr. 25, 578). Plaintiff did obtain glucagon in March or April before the October hearing, but as the ALJ noted, despite Plaintiff's claim of frequent hypoglycemic episodes, she testified that she had not yet had occasion in the intervening six months to use the glucagon. (Tr. 25, 49-50). Plaintiff testified that she declined her doctor's prescription for Lyrica to treat her alleged burning sensation, but she did not attribute her decision to financial considerations or even fear the treatment would not succeed (Tr. 48). As for her diet, Plaintiff contends that gastroparesis prevented her from adhering to a regime that would stabilize her blood sugar. However, that does not explain why Plaintiff did not see a dietician as recommended, or why she failed to follow a special gastroparesis diet as Dr. Schopmeyer had suggested (Tr. 553).

Lastly, the ALJ noted that Plaintiff's activities were inconsistent with a finding of disability. He noted, for example, that Plaintiff's impairments had been present during periods in which she was performing full-time work, and that her functioning had not declined since the first hearing and decision (Tr. 24-25). He noted that Plaintiff cared for her grandchildren two to three times per week and that, at the time of the first hearing, she had been volunteering at a food bank two times per week (Tr. 25). He also noted that wage earnings showed that around the time of the second hearing Plaintiff was working more than 20 hours weekly, and at times as much as 39 hours weekly (Tr. 25). Plaintiff testified that she continued to live alone, drive, take care of her home, and undertake such physical activities as mowing her lawn (Tr. 42-43, 46, 51, 68, 70-71). The regulations permit the ALJ to consider such activities when assessing the credibility of

Plaintiff's testimony regarding her symptoms and limitations. See 20 C.F.R. § 404.1529(c)(3)(i). *See also Pepper v. Colvin*, 712 F.3d 351, 369 (7th Cir. 2013) ("The ALJ concluded that, taken together, the amount of daily activities Pepper performed, the level of exertion necessary to engage in those types of activities, and the numerous notations in Pepper's medical records regarding her ability to engage in activities of daily living undermined Pepper's credibility when describing her subjective complaints of pain and disability"); *Pope v. Shalala*, 998 F.2d 473, 487 (7th Cir. 1993) ("Finally, the ALJ considered [the claimant's] daily activities which include light chores and reading. On this record, there is substantial evidence to support the ALJ's finding that [the claimant could perform sedentary work, and was not disabled."); *Steward v. Bowen*, 858 F.2d 1295, 1299, 1300 n.7 (7th Cir. 1988) (part-time work may be considered in determining whether a claimant was disabled). It is clear that the ALJ properly predicated his credibility determination on multiple criteria, each consistent with the regulations.

Accordingly, this court holds that the ALJ's decision will be affirmed. As discussed, the ALJ did not fail to consider all of Plaintiff's impairments in combination, did not err in finding that Plaintiff could perform past relevant work, and did not improperly assess Plaintiff's credibility.

## Conclusion

On the basis of the foregoing, the ALJ's decision is hereby AFFIRMED.


Entered: October 16, 2017.

s/ William C.  Lee
William C. Lee, Judge
United States District Court
